IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CASE NO.: 6:23-cv-193-CEM-LHP

UNITED STATES OF AMERICA
*ex rel.* PEDRO HERRERO,

    Plaintiff,

v.

MATRIX COMPOSITES, INC.,
and ITT, INC.,

    Defendants.

_____ /

**FILED UNDER SEAL**
**PURSUANT TO 31 U.S.C. §**
**3730(b)(2)**

DEMAND FOR JURY TRIAL

DO NOT PLACE ON PACER

*SEALED*

## *QUI TAM* COMPLAINT

Plaintiff-Relator, Pedro Herrero ("Herrero" or "Relator"), by and through

undersigned counsel, brings this civil action—as a *qui tam* relator pursuant to 31

U.S.C. § 3730(b)—on behalf of the United States of America (the "U.S.

Government"), its departments, and its agencies, against Defendants, Matrix

Composites, Inc. ("Matrix"), and ITT, Inc. ("ITT") (collectively, Matrix and ITT

shall be referred to as "Defendants"), and alleges based upon personal knowledge

and relevant documents as follows:

### INTRODUCTION

1.    This is a civil action to recover for treble damages, civil penalties, and

other remedies under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq.*

2.     This action specifically relates to Defendants' conspiracy to defraud the U.S. Government by engaging in systematic practices (each systematic practice being inextricably intertwined with the other systematic practices) of improper revenue recognition, fabrication of engineering labor costs, and false recharacterization of requests for advance payments in order to obtain greater payment from the U.S. Government without justification.

3.     For example, Matrix falsified in excess of $1 million in engineering labor costs to the upstream U.S. Government contractor, Lockheed Martin Corporation ("Lockheed"). Moreover, Matrix has no time records or other documentation to support **any** of its engineering labor costs.

## I. The FCA

4.     The FCA allows private persons to file qui tam actions alleging that defendants defrauded the federal government.   In relevant part, 31 U.S.C. § 3729(a)(1) provides that:

*Any person who—*

*(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;*

*(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]*

*(C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);*

*. . .*

***is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000,*** as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104–410 [1]), ***plus 3 times the amount of damages which the Government sustains because of the act of that person.***

Emphasis added.

5.     The FCA also provides that a private person may bring a *qui tam* action pursuant to 31 U.S.C. § 3729 on behalf of themselves and the U.S. Government. 31 U.S.C. § 3730(b)(1). The private person who brings the *qui tam* action on behalf of the U.S. Government is known as the "Relator."

6.     Under the FCA, the terms "'knowing' and 'knowingly—(A) mean that a person, with respect to information—(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud[.]" 31 U.S. Code § 3729(b)(1).

7.     The term "claim":

(A) means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that—
(i) is presented to an officer, employee, or agent of the United States; or

(ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—

(I)   provides or has provided any portion of the money or property requested or demanded; or

(II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded;

(B) does not include requests or demands for money or property that the Government has paid to an individual as compensation for Federal employment or as an income subsidy with no restrictions on that individual's use of the money or property[.]

31 U.S. Code § 3729(b)(2).

8.      In accordance with the requirements of 31 U.S.C. § 3730(b)(2), prior to filing this Complaint, Relator served a copy of same upon the U.S. Government with a written Disclosure Statement, setting forth and enclosing all material evidence and information that he possesses.

9.      Relator's action is not barred by the applicable statute of limitations for FCA claims under 31 U.S.C. § 3731(b), because the instant action was brought less than six years after the dates on which Defendants committed the underlying FCA violations and less than three years after the date when the responsible United States official knew or reasonably should have known of the facts material to the underlying FCA violations.

10.     All conditions precedent have been met, waived, or excused prior to Relator bringing this lawsuit.

## II. The Federal Acquisition Regulation

11.     The Federal Acquisition Regulation ("FAR"), codified in Chapter 1 of

Title 48 of the C.F.R., is comprised of various subchapters, parts, and subparts, and

"is the primary regulation for use ***by all executive agencies in their acquisition of***

***supplies and services*** with appropriated funds."[1]

12.     The FAR applies broadly, "to all acquisitions as defined in part 2 of the

FAR, except where expressly excluded." 48 C.F.R. § 1.104.

13.     Under the FAR, an "Acquisition" means:

> ***the acquiring by contract with appropriated funds of supplies or***
> ***services (including construction) by and for the use of the Federal***
> ***Government*** through purchase or lease, whether the supplies or
> services are already in existence or must be created, developed,
> demonstrated, and evaluated. Acquisition begins at the point when
> agency needs are established and includes the description of
> requirements to satisfy agency needs, solicitation and selection of
> sources, award of contracts, contract financing, contract performance,
> contract administration, and those technical and management functions
> directly related to the process of fulfilling agency needs by contract.
> occurs when the government enters into a contract for the purchase of
> supplies or services to be paid by appropriated funds.

48 C.F.R. § 2.101 (emphasis added).

14.     According to the FAR's statement of guiding principles for the Federal

Acquisition System (the "System"), the System is designed to deliver efficient

---

[1] FEDERAL ACQUISITION REGULATION, FOREWORD: https://www.acquisition.gov/far/forwarda (emphasis added). The FAR "became effective on April 1, 1984 and is issued within applicable laws under the joint authorities of the Administrator of General Services, the Secretary of Defense, and the Administrator for the National Aeronautics and Space Administration, under the broad policy guidelines of the Administrator, Office of Federal Procurement Policy, Office of Management and Budget." FEDERAL ACQUISITION REGULATION, FOREWORD: https://www.acquisition.gov/far/forwarda.

products or services to the consumer in a manner which maintains the public's trust. 48 C.F.R. § 1.102(a). The FAR's statement of guiding principles further notes that the System is designed to minimize costs and promote honest business:

> (b) The Federal Acquisition System will -
> (1) Satisfy the customer in terms of cost, quality, and timeliness of the delivered product or service by, for example-
> (i) Maximizing the use of commercial products and commercial services;
> (ii) Using contractors who have a track record of successful past performance or who demonstrate a current superior ability to perform; and
> (iii) Promoting competition;
> **(2) Minimize administrative operating costs;**
> **(3) <u>Conduct business with integrity</u>, fairness, and openness**; and
> (4) Fulfill public policy objectives.

48 C.F.R. § 1.102(b) (emphasis added).

15.    Per the FAR, the "Federal Acquisition Team" (the "Acquisition Team") "consists of all participants in Government acquisition including not only representatives of the technical, supply, and procurement communities but also the customers they serve, ***and the contractors who provide the products and services***." 48 C.F.R. § 1.102(c) (emphasis added).

16.    The FAR mandates that the actions of each member of the Acquisition Team "***must reflect <u>integrity, fairness, and openness</u>***." 48 C.F.R. § 1.102-2(c) (emphasis added). The FAR further explicitly provides that: "***each member of the [Acquisition] <u>Team is responsible and accountable for the wise use of public resources as well as acting in a manner which maintains the public's trust.</u>***

6

***Fairness and openness require open communication among team members, internal and external customers, and the public.***" *Id.* (emphasis added).

17.     As will be discussed in greater detail below: i) the underlying contracts at issue in this case are related to an "Acquisition" as defined by the FAR; ii) Lockheed and Matrix—as contracting parties related to an "Acquisition"—are bound by the FAR's statement of guiding principles; and iii) Lockheed and Matrix are members of the Acquisition Team.

18.     Furthermore, Subpart 52.232-32 of the FAR regarding "Performance Based Payments" is applicable to the Acquisition that is central in this case.

## JURISDICTION

19.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1345 and 28 U.S.C. § 1331.

20.     This Court has personal jurisdiction over Defendants because 31 U.S.C. § 3732(a) authorizes nationwide service of process and because the Defendants have minimum contacts with the United States. Moreover, the acts proscribed by the FCA occurred in this judicial district. Finally, Matrix resides and transacts business, including business relating to Defendants' underlying misconduct, in this judicial district.

## VENUE

21.      Venue is proper in the Middle District of Florida pursuant to 31 U.S.C. § 3732(a) because Matrix can be found, resides, and transacts business, including business relating to Defendants' underlying misconduct, in this judicial district. Moreover, the underlying acts proscribed by 31 U.S.C. § 3729(a) occurred in this judicial district.

## THE PARTIES

22.      The Relator brings this action on behalf of himself and the U.S Government, including its agency, the Department of Justice (the "DOJ") and all other government defense programs. The allegations of this Complaint are based on information of which Relator has direct and independent knowledge, within the meaning of 31 U.S.C. § 3730(e)(4)(B). Relator is the original source of these allegations as defined in 31 U.S.C. § 3730(e)(4)(B). Relator has knowledge of the false claims and false records that Defendants knowingly, falsely and fraudulently created and submitted to the upstream U.S. government contractor as he alleges herein.

23.      Relator is a citizen of the United States and resides in Sarasota, Florida.

24.      Defendant ITT Inc. ("ITT") is a public corporation incorporated in Indiana with its principal place of business in Stamford, Connecticut.

8

25.   Defendant Matrix Composites, Inc. ("Matrix") is a Florida corporation with its global headquarters in Rockledge, Florida.

## FACTUAL BACKGROUND

### I.   Relevant Background Regarding Relator

26.   Relator has worked in the accounting industry for 29 years.

27.   Relator was employed by Matrix as a "Controller" from May 1, 2022 to August 3, 2022.

28.   Relator was Matrix's fifth Controller in three years.

29.   As a Controller, Relator's duties included controllership duties such as maintaining accounting records, approving journal entries and reporting financial results.

30.   In his capacity as Controller, Relator gained and possessed personal knowledge of the fraudulent schemes described herein.

31.   Relator resigned from his position as Matrix's Controller on or around on July 25, 2022, shortly after his discovery of the underlying fraudulent scheme and finding gainful employment elsewhere.

### II.   Relevant Background Regarding Lockheed

32.   Lockheed is one of the United States' largest defense contractors.[2]

---

[2] *See* USASPENDING, https://www.usaspending.gov/keyword_search/Lockheed%20Martin (last visited Sept. 13, 2022) (showing that the government has awarded Lockheed Martin nearly one million different contracts).

33.     Lockheed is the eleventh largest recipient of government funds from contracts over the last twelve months.[3]

34.     Lockheed's longstanding relationship with the United States' military traces its beginning to delivering the first purpose-built bomber for United States in the final months of the First World War.[4]

35.     In the 2021 Fiscal Year, the United States Government awarded Lockheed a total amount of $41,800,000,000.00 in government contracts.[5]

36.     The U.S. Government continues to trust Lockheed with developing and delivering the nation's most critical and sensitive military assets.[6]

37.     Lockheed has been developing and delivering F-22 Raptor Fighters ("F-22") for the United States for over two decades.[7]

38.     Lockheed is a prime government contractor for the F-22 production and is responsible for subcontracting with vendors to produce the F-22 and its component parts.

---

[3] *See* USASPENDING, https://www.usaspending.gov/recipient (last visited Sept. 13, 2022).

[4] *See* Lockheed Martin, *Innovation With Purpose, Lockheed Martin's First 100 Years*, 25-26 (2013), https://www.lockheedmartin.com/content/dam/lockheed-martin/eo/documents/ebook/Innovation-with-Purpose.pdf.

[5] *See* USASPENDING, https://www.usaspending.gov/recipient/b97d19b0-833c-8d8f-3a2c-157d04ea55ef-P/2021 (last visited Sept. 13, 2022).

[6] *See* U.S. DEPARTMENT OF DEFENSE, https://www.defense.gov/News/Contracts/Contract/Article/3067663/ (awarding Lockheed Martin a $578 million dollar contract in June 2022) (last visited Sept. 13, 2022).

[7] *See* LOCKHEED MARTIN, https://www.lockheedmartin.com/en-us/news/features/history/f-22.html (last visited Sept. 13, 2022).

### III.    Relevant Background Regarding Matrix

39.    Matrix is a specialty aerospace component manufacturer with a focus on precision composite components.

40.    In 2019, ITT acquired Matrix.

41.    Based upon Relator's personal knowledge, Matrix has a historic lack of oversight and internal mechanisms to assure billing accountability.

42.    Such lack of accountability is exemplified by Matrix's volume of turnover in its "Controller" position. As already mentioned, Relator is Matrix's fifth Controller in three years.

43.    Furthermore, based upon Relator's personal knowledge, Matrix has, in the past, not reserved allowances for obsolete inventory of certain plastics with an inherent short-life expectancy as "inventory" *after* the plastics have expired.

44.    Moreover, Relator established an early professional relationship with the Matrix general manager at that time, Troy Shearouse, who confided in Relator that Matrix's 2022 financial results were poor due to mismanagement in the prior year, recording deposits as revenue that should have been recognized as revenue in the current year. In discussions with Relator, the current Human Resources manager who was previously in Matrix's accounting department confirmed that the prior controller, under the behest of the prior general manager, had reported deposits as

revenue for accounting purposes. Such information led to Relator's inquiry that revealed the underlying fraudulent scheme.

45.    Matrix's history of controller turnover, improper categorization of inventory, and improper accounting (characterization of deposits as revenue) at least as of 2021 are all indicia of Matrix's endemic lack of oversight and internal mechanisms to assure billing accountability, which, as will be discussed below, contributed to the inception and perpetuation of the underlying fraudulent scheme.

## IV.    Relevant Background Regarding ITT

46.    ITT provides engineering and manufacturing services through its operating segments and subsidiary corporations.

47.    ITT acquired Matrix in 2019.

48.    Following ITT's acquisition of Matrix, certain ITT employees, who were involved in and/or otherwise had knowledge of the underlying fraudulent scheme, became so involved in the business affairs of Matrix that such employees' involvement and/or knowledge of the underlying fraudulent scheme can be fairly imputed upon Matrix. Along the same vein, following ITT's acquisition of Matrix, certain Matrix employees, who were involved in and/or otherwise had knowledge of the underlying fraudulent scheme, were under the direction and control of ITT, such that their involvement and/or knowledge of the underlying fraudulent scheme can be fairly imputed to ITT.

49.    Following ITT's acquisition of Matrix, ITT pressed Matrix to begin reporting profitable monthly results after a period of continuous monthly losses. Such was evidenced by, for example, the CEO of ITT, Luca Silva, being directly involved in Matrix (despite Matrix being a small division of ITT) and requiring that Matrix management present a "turnaround plan" to turn a profit.

## V.    The Contractual Agreements

A. The "Government Contract"

50.    Prior to December of 2018, the U.S. Government, via the Department of Defense, entered into a contract with Lockheed (the "Government Contract"), whereby Lockheed would produce a certain number of F-22s for the U.S.

51.    Given the engagement between Lockheed and an "executive agency" (i.e., the Department of Defense) for the U.S. Government's "acquisition" of F-22s, Lockheed is bound by the FAR's guiding principles for the System regarding fairness, openness, and integrity. It further follows that Lockheed is part of part of the "Acquisition Team" related to the Government Contract. As a member of the Acquisition Team, Lockheed must "***conduct business with integrity, fairness, and openness***" and be "***accountable for the wise use of public resources as well as acting in a manner which maintains the public's trust.***" 48 C.F.R. § 1.102(c) (emphasis added).

52.     Furthermore, for reasons discussed below, Subpart 52.232-32 of the FAR (the particulars of which will be discussed below) is part of the Government Contract, such that Lockheed itself is bound by and must act consistent with Subpart 52.232-32 of the FAR.

B. The "Matrix Subcontract" and "Matrix Amendment"

53.     Lockheed subsequently, on or around December of 2018, entered into a contract with Matrix (the "Matrix Subcontract") to manufacture specialty composite spare parts for the F-22. *See* Email (attached as **Exhibit A**).

54.     The Matrix Subcontract has a reference number of "6534716808."

55.     The Matrix Subcontract has a contract target value of $4,377,934.000— comprised of approximately $2.4 million for products and $1.9 million for engineering—and a target end date of December 31, 2021. *Id.; see also* Revenue Recognition Email at 3 (attached as **Exhibit B**).

56.     The Matrix Subcontract was subsequently amended on March 2, 2022 (the "Matrix Amendment"). *Id.* The Matrix Amendment increased the total contract target value to $5,983,868.00. *Id*.

57.     The Matrix Subcontract explicitly references Subpart 52.232-32 of the FAR, which relates to "Performance-Based Payments," such that Matrix is bound by and must act consistent with it. Thus, Subpart 52.232-32 of the FAR is a flow-down clause from the Government Contract.

14

58.    Given the Matrix Subcontract's explicit reference to Subpart 52.232-32 of the FAR, as well as Matrix's role as a subcontractor, Matrix is bound by the FAR's guiding principles for the System regarding fairness, openness, and integrity and is further part of the "Acquisition Team" related to the Government Contract. As a member of the Acquisition Team, Matrix must "***conduct business with integrity, fairness, and openness***" and be "***accountable for the wise use of public resources as well as acting in a manner which maintains the public's trust.***" 48 C.F.R. § 1.102(c) (emphasis added).

## VI.    The "Underlying Fraudulent Scheme"

### A. Overview

59.    As will be described in greater detail below, during the course of his employment, Relator discovered that Matrix—with ITT's knowledge—had been engaging in systematic practices (each systematic practice being inextricably intertwined with the other systematic practices) of improper revenue recognition, fabrication of engineering labor costs, and false recharacterization of requests for Performance Based Payments (PBPs) in order to: i) increase the total amount due to Matrix from Lockheed; ii) increase the total amount due to Lockheed and Matrix from the U.S. Government; and iii) materially induce the U.S. Government to pay Lockheed (the "Underlying Fraudulent Scheme"). Such Underlying Fraudulent Scheme resulted in an excess of $1,000,000.00 in fraudulent billings to Lockheed. It

was foreseeable that Lockheed would use that spreadsheet for Lockheed to receive payment from the U.S. Government, at least in part, pursuant to the Government Contract.

### a. *Improper Revenue Recognition*

60.    Since at least 2019, Matrix has been engaging in a systematic practice of improper revenue recognition related to the Matrix Subcontract.  ITT has had knowledge of such practice since at least April of 2020.

61.    As mentioned above, the Matrix Subcontract had an original value of $4,377,934.00—comprised of approximately $2.4 million related to products and $1.9 million related to engineering (known as "NRE"). *See* **Exhibit B** at 3.

62.    During 2019, Matrix billed Lockheed roughly $1.4 million for engineering-related and some tooling-related milestones through requests for PBPs. *Id.* at 3, 5.[8]  Such requests for PBPs were, in essence, requests for advanced-payments.

63.    On April 6, 2020, Karen LaRue, ITT's Corporate Senior Accounting Director, sent an email (the "Improper Revenue Recognition Email") to the following ITT employees: i) Thomaz London; ii) John Capela; and iii) Le Le Tran. *Id.* at 3-4.  Therein, **Ms. LaRue explained that Matrix prematurely recognized**

---

[8] Lockheed subsequently paid Matrix roughly $1.122 million. **Exhibit B** at 3.  Matrix had a receivable on its books for $350,000.00, resulting in the discrepancy between the $1.4 million request for PBPs and receipt of $1.122 million. *Id.*

approximately **$1.4 million worth of the revenue related to engineering in 2019** when such revenue should have been recognized in 2020 (and the $1.4 million recorded as a liability in 2019). *Id.* at 3-4. According to Ms. LaRue, revenue related to engineering should be recognized at the same time as parts were shipped; thus, Ms. LaRue assumed that Matrix would ship all the remaining parts in the entirety of the Matrix subcontract price (i.e. $4,377,934.000) and recognize the revenue in 2020. *Id.* In her email, Ms. LaRue explains that revenue related to engineering should have been recognized in this manner because Matrix is "not actually transferring anything to the customer for that work (e.g., intellectual property)." *Id.* Put another way, by improperly recognizing the $1.4 million as "revenue," as opposed to recording the $1.4 million as a "liability," in 2019, Matrix made the $1.4 million appear to be earned dollars as opposed to advanced-payments.[9]

64.     By improperly recognizing the roughly $1.4 million in requests for advanced-payments (i.e. the requests for PBPs) as "revenue" instead of as a "liability," Matrix was able to avoid the copious paperwork necessary to substantiate advances of funds that should have been recorded as a "liability" and backed by data on engineering hours worked. For instance, Matrix was able to avoid substantiating its purported engineering labor costs (discussed in greater detail below) with hour

---

[9] Based upon Relator's personal knowledge, Matrix did not issue a new financial statement for 2019.

17

logs. Put another way, by improperly recognizing the roughly $1.4 million in requests for advanced-payments (i.e. the requests for PBPs) as "revenue," Matrix "made room" for an excess of $1 million in fabricated engineering labor costs (discussed in greater detail below), while decreasing the likelihood of scrutiny or detection.

65. It is worth noting that, in addition to being an inextricably intertwined component of the Underlying Fraudulent Scheme, Matrix's systematic practice of improper revenue recognition reflected Matrix's willingness to participate in fraudulent behavior of the type exemplified through the aforementioned fraudulent scheme. As discussed above, Matrix improperly recognized $1.4 million worth of the revenue related to engineering associated with the Matrix Subcontract in 2019 when such revenue should have been recognized in 2020. *See* Improper Revenue Recognition Email (**Exhibit B**) at 3-4. More specifically, Matrix recognized approximately $400,000.00 of the $1.4 million prior to ITT's acquisition of Matrix.

66. By repeatedly engaging in the practice of improper revenue recognition, Matrix has violated the FAR's guiding principles for the System and its duties as an Acquisition Team member, both of which mandate "integrity, fairness, and openness," and "use of public resources...in a manner which maintains the public's trust." 48 C.F.R. § 1.102(a),(b)(3), and (c).

18

b. *Fabrication of Engineering Labor Costs*

67.     Since at least October of 2021, Matrix—ITT's knowledge—has been engaging in a systematic practice of fabricating engineering labor costs related to the Matrix Subcontract.

68.     Included as part of **Exhibit A**, is a spreadsheet, titled "Termination Liability Funding Forecast."

69.     Lockheed provided the spreadsheet (without any values) to Jeff Chaney, Matrix's former head of Engineering, for completion (i.e. insertion of purported values). Mr. Chaney, as instructed by his superiors, subsequently inputted the purported values into the spreadsheet and returned same to Lockheed in order for Matrix to receive payment pursuant to the Matrix Subcontract. It was foreseeable that Lockheed would use that spreadsheet for Lockheed to receive payment from the U.S. Government, at least in part, pursuant to the Government Contract.

70.     The Termination Liability Funding Forecast spreadsheet purports to track Matrix's incurred costs and planned billings to Lockheed for the period spanning from March 2019 through August 2022. More specifically: i) Column 11, titled "Cumulative Commitments" purports to reflect cumulative costs incurred for tooling and material; ii) Column 15, titled "Non Material Cumulative Expenditures (Labor, Ovds, Other Direct Costs Plus Profit)," purports to reflect cumulative engineering labor costs; and iii) Column 19, titled "Planned Billings to Lockheed

Martin," purports to reflect billings, known as "Progress Billings,"[10] to Lockheed for engineering and tooling related fees.

71. Based upon Relator's personal knowledge (which will be discussed in greater detail below), the cumulative engineering labor costs reflected in Column 15, titled "Non Material Cumulative Expenditures (Labor, Ovds, Other Direct Costs Plus Profit)," are inaccurate and based, in part, on an excess of $1 million dollars-worth of fabricated engineering labor costs. More specifically, Mr. Chaney, as instructed by his superiors, populated the fabricated engineering labor costs throughout Column 15 with false values with dates as far back as March of 2019 (i.e. the date of Matrix's first purported request for PBPs to Lockheed, which stands in the shoes of the U.S. Government for purposes of Matrix's requests for PBPs to Lockheed).

Matrix's practice of fabricating engineering labor costs is intrinsically intertwined with the other practices which form the Underlying Fraudulent Scheme. By inserting false engineering labor costs in Column 15 of the Termination Liability Funding Forecast spreadsheet (purportedly per Lockheed's instructions to add an excess of $1 million to its invoices), Matrix: i) falsely recharacterized advanced payments as earned revenue (as opposed to "liabilities" owed on advanced revenues)

---

[10] Among the Progress Billings in Column 19 are some of Matrix's requests for PBPs. Again, Lockheed has paid Matrix at least approximately $1.122 million in PBPs. **Exhibit B** at 3.

without any factual support for the engineering hours that would have been expended to earn such revenues; and ii) made room" for the additional amounts billed falsely by recharacterizing (what are, in essence "liabilities" for such advance payments received) as such funds having been  earned revenues (i.e. no longer owed as a liability).

72.     Given that Matrix submitted the Termination Liability Funding Forecast spreadsheet to Lockheed, which, in turn, would be used for reimbursement and submitted the U.S. Government, Matrix's practice of the fabrication of engineering labor costs has resulted in an excess of $1,000,000.00 in fraudulent billings to Lockheed. It was foreseeable that Lockheed would use that spreadsheet for Lockheed to receive payment from the U.S. Government, at least in part, pursuant to the Government Contract.

73.     By engaging in such practice of fabricating engineering labor costs, Matrix violated and continues to violate the FAR's guiding principles for the System and its duties as an Acquisition Team member, both of which mandate "integrity, fairness, and openness," and "use of public resources…in a manner which maintains the public's trust." 48 C.F.R. § 1.102(a),(b)(3), and (c).

c. *False Recharacterization of Requests for PBPs*

    i. <u>Subpart 52.232-32 of the FAR</u>

74.    As previously mentioned, the Matrix Subcontract explicitly references Subpart 52.232-32 of the FAR regarding "Performance-Based Payments."

75.    Paragraphs (b), (c)(1), (1) and (m) of Subpart 52.232-32 of the FAR sets forth certain parameters with respect to a contractor's request for PBPs (including the requirement that a contractor include a certification with his/her request for payment), as well as a contracting officer's approval of same:

> (b) *Contractor request for performance-based payment.* ***The Contractor may submit requests for payment of performance-based payments*** not more frequently than monthly, in a form and manner acceptable to the Contracting Officer. Unless otherwise authorized by the Contracting Officer, all performance-based payments in any period for which payment is being requested shall be included in a single request, appropriately itemized and totaled. ***<u>The Contractor's request shall contain the information and certification detailed in paragraphs (l) and (m) of this clause</u>***.
>
> (c) Approval and payment of requests. (1) ***<u>The Contractor shall not be entitled to payment of a request for performance-based payment prior to successful accomplishment of the event or performance criterion for which payment is requested</u>. The Contracting Officer shall determine whether the event or performance criterion for which payment is requested has been successfully accomplished in accordance with the terms of the contract. The Contracting Officer may, at any time, require the Contractor to substantiate the successful performance of any event or performance criterion which has been or is represented as being payable***.
>
> …

22

(l) *Content of Contractor's request for performance-based payment*. **The Contractor's request for performance-based payment shall contain the following**:

(1) The name and address of the Contractor;

(2) The date of the request for performance-based payment;

(3) The contract number and/or other identifier of the contract or order under which the request is made;

(4) Such information and documentation as is required by the contract's description of the basis for payment; and

(5) ***A certification by a Contractor official authorized to bind the Contractor, as specified in paragraph (m) of this clause***.

(m) *Content of Contractor's certification*. As required in paragraph (l)(5) of this clause, the Contractor shall make the following certification in each request for performance-based payment:

I certify to the best of my knowledge and belief that-

(1)    **This request for performance-based payment is true and correct; this request (and attachments) has been prepared from the books and records of the Contractor, in accordance with the contract and the instructions of the Contracting Officer;**

(2)    (Except as reported in writing on _____ ), all payments to subcontractors and suppliers under this contract have been paid, or will be paid, currently, when due in the ordinary course of business;

(3)    There are no encumbrances (except as reported in writing on _____ ) against the property acquired or produced for, and allocated or properly chargeable to, the contract which would affect or impair the Government's title;

(4)    There has been no materially adverse change in the financial condition of the Contractor since the submission

by the Contractor to the Government of the most recent written information dated _____; and

(5)    After the making of this requested performance-based payment, the amount of all payments for each deliverable item for which performance-based payments have been requested will not exceed any limitation in the contract, and the amount of all payments under the contract will not exceed any limitation in the contract.

Emphasis added.

76.    Given FAR 52.232-32's applicability to the Matrix Subcontract, "Contractor" means "Matrix" for purposes of FAR 52.232-32.  Thus, pursuant to paragraphs (l) and (m) above, every time Matrix sends a request for a PBP—to the "Contracting Officer" (the meaning of which is discussed in greater detail below), Matrix is required to that the "**request for performance-based payment is true and correct.**" Emphasis added.

77.    Moreover, for purposes of FAR 52.232-32's application to the Matrix Subcontract, "Contracting Officer" and "Government" means "Lockheed" such that Lockheed stands in the shoes of the U.S. Government for purposes of Matrix's certification of the contents of its requests for PBP. *See* Lockheed Martin Corporation Prime Supplemental Flowdown Document (PSFD) at 4, attached as **Composite Exhibit C-1** (including FAR 52.232-32 Performance Based Payments (APR 2012) as a flowdown clause and noting that "'***Contracting Officer' and 'Government' means 'Lockheed Martin'*** except with respect to title for property where the references to the Government shall be unchanged.") (emphasis added);

24

Lockheed Martin Aeronautics Company PSFD at 3, attached as **Composite Exhibit C-2** (same).[11]  Therefore, each time Matrix sends a request for PBPs to Lockheed, Matrix is, in essence, sending an invoice and certification to the U.S. Government.

  ii. The Recharacterization of the Requests for PBPs in a False Light

78. Given Subpart FAR 52.232-32's application to the Matrix Subcontract, in every instance that Matrix has sent Lockheed (which stands in the shoes of the U.S. Government for purposes of PBPs to Matrix) a request for PBPs, Matrix would be required to certify to the veracity of the request for PBPs in accordance with the Subpart 52.232-32 of the FAR, described above. *See* subsection (m)(1) of Subpart 52.232-32 of the FAR (requiring that Matrix certify that the "**request for performance-based payment is true and correct.**") (emphasis added).

79. As previously mentioned, some of Matrix's requests for PBPs are misconstrued in Column 19 of the Termination Liability Funding Forecast spreadsheet as requests for payment for work actually performed.[12]

---

[11] Attached as **Composite Exhibit C** are two sample PSFDs, whereby Lockheed imposed specific requirements upon certain subcontractors.  Although such sample PSFDs do not appear to be applicable here, they nevertheless are instructive in that they demonstrate how Subpart 52.232-32 of the FAR (APR 2012)—the same version of the specific FAR applicable here—operates when utilized as a flowdown clause by Lockheed in a subcontract context.  Put another way, because Lockheed stands in the shoes of the U.S. government for purposes of PBPs in the two sample PSFDs, Lockheed would also stand in the shoes of the U.S. government for purposes of PBPs with respect to the Matrix Subcontract.

[12] As previously mentioned, Matrix billed Lockheed (which stands in the shoes of the U.S. Government for purposes of PBPs to Matrix) roughly $1.4 million for engineering and tooling related milestones through requests for PBPs during 2019, and Lockheed (which stands in the shoes of the U.S. Government for purposes of PBPs to Matrix) subsequently paid Matrix roughly $1.122 million. *See* **Exhibit B** at 3, 5.

80.     Notably, with respect to such requests for PBPs reflected in Column 19 of the Termination Liability Funding Forecast spreadsheet, Matrix—ITT's—falsely recharacterized the express certifications related to such requests in October of 2021 (i.e. when Matrix began engaging in the systematic practice of fabricating engineering labor costs via Mr. Chaney, as instructed by his superiors). Put another way, when Matrix fabricated engineering labor costs in October of 2021, Matrix: i) created a false record (i.e. the Termination Liability Funding Forecast spreadsheet); and ii) created a false certification by recharacterizing, in a false light, those requests for PBPs reflected in Column 19 of the Termination Liability Funding Forecast spreadsheet in that Matrix's requests for PBPs no longer appeared to be requests for advance-payments, but rather requests for payments for work actually performed (i.e. earned dollars). As such, Matrix's express certifications related to the requests for PBPs reflected in Column 19 of the Termination Liability Funding Forecast spreadsheet are no longer "true and correct." *See* subsection (m)(1) of Subpart 52.232-32 of the FAR. Moreover, given that Matrix fabricated an excess of $1 million dollars-worth of engineering labor costs in Column 15 of the Termination Liability Funding Forecast spreadsheet, Matrix recharacterized an excess of $1 million dollars-worth of requests for PBPs to Lockheed (standing in the shoes of the U.S. Government for purposes of PBPs to Matrix), thereby materially inducing

continued PBPs (and other payments) by the U.S. Government to Matrix and Lockheed).

81.    By engaging in a practice of falsely recharacterizing requests for PBPs, Matrix—in addition to violating Subpart 52.232-32 of the FAR, has violated the FAR's guiding principles for the System and its duties as an Acquisition Team member, both of which mandate "integrity, fairness, and openness," and "use of public resources…in a manner which maintains the public's trust." 48 C.F.R. § 1.102(a),(b)(3), and (c).

B.    Relator's Discovery of the Underlying Fraudulent Scheme

82.    As mentioned above, Relator began working at Matrix on May 1, 2022.

83.    On or around June 9, 2022, Relator completed an analysis of Matrix's Progress Billings to Lockheed.  Relator's analysis is memorialized in an email—dated June 9, 2022—sent to certain of Relator's senior managers: i) Jeff Chaney, Matrix's head of Engineering at the time; ii) Uriel Garcia, ITT's Financial Controller and Relator's direct superior; and iii) Troy Shearouse, Plant Manager. *See* Email, **Exhibit A**.  A few hours later, Mr. Garcia briefly responded to Relator's email, praising him for his work. *Id.*  Notably, Mr. Garcia forwarded Relator's email, by way of a separate email thread, to Erika Avalos, the Executive Director of Finance and Accounting at ITT Aerospace Controls. *Id.* Ms. Avalos denied that any revenue recognition issue existed.

84.    In his June 9, 2022 email, Relator expressed his concern regarding how Matrix had been recognizing revenue related to engineering under the Matrix Subcontract.[13] Email, **Exhibit A**.  More specifically, Relator posed the following question in his email: "Do progress billings meet revenue recognition criteria or should a portion be recorded as unearned revenue and recognized in conjunction with parts manufactured and shipped?" *Id.* Relator further urged the implementation of internal controls to identify when Progress Billings "can be recognized as revenue." *Id.*

85.    In his June 9, 2022 email, Relator further expressed his concern regarding Matrix's purported engineering labor costs related to the Matrix Subcontract. To that end, Relator attached the Termination Liability Funding Forecast spreadsheet (discussed above), which purports to reflect (among other items) Matrix's cumulative engineering labor costs through August of 2022. *Id.* In his email, Relator explicitly stated that: "*[t]he engineering labor costs aren't*

---

[13] Shortly after Relator sent his June 9, 2022 email, Gaston Jouly—of ITT's internal audit department—forwarded, on June 20, 2022, an email thread, which included the Improper Revenue Recognition Email, to Relator, Mr. Garcia, and Ms. Avalos (whose titles are detailed above). **Exhibit B** at 1. Such Improper Revenue Recognition Email demonstrates that Matrix's management was aware of Matrix's improper revenue recognition practice since at least as early as April 6, 2020. Further, once Ms. Avalos received the forwarded Improper Revenue Recognition Email, she admitted, on a conference call with Matrix and ITT management, including Ryan Flynn, SVP, President- Connect and Control Technologies at ITT Inc., that Matrix had incorrectly recorded approximately $1 million in revenue in 2021, which had not been earned and thus, should have been recorded as a liability.

*substantiated by any support documentation such as project labor hour logs" and that there is "no support to substantiate significant engineering labor hours included in progress billings." Id. Relator additionally urged the implementation of internal controls "to properly authorize, document and ensure the accuracy of progress billings." Id.* (emphasis added).

86.    Notably, during a subsequent conversation between Relator and a VP in ITT's engineering department, such VP acknowledged Relator's concerns regarding Matrix's purported engineering labor costs when Relator noted to such VP that Matrix needed to start tracking engineering hours because, if the Government Contract Auditor were to audit Matrix, Matrix would be unable to substantiate its costs incurred with respect to engineering labor.

87.    Based upon Relator's personal knowledge, Relator knew that Matrix's cumulative engineering labor costs reflected in Column 15 of the Termination Liability Funding Forecast were inaccurate and based, in part, on fabricated engineering labor costs.

88.    During the course of his employment with Matrix, Mr. Chaney—Matrix's head of Engineering at the time—informed Relator that, around October of 2021, a Lockheed employee (the "Lockheed Initiator") emailed Mr. Chaney and instructed Mr. Chaney to invoice Lockheed an excess of $1,000,000.00 even though Matrix had insufficient engineers to fulfill the additional one million dollars-worth

of engineering labor—let alone the dollar value of engineering labor for which Lockheed originally subcontracted Matrix (the "Lockheed Instruction Email"). Mr. Chaney further informed Relator that he subsequently did as the Lockheed Instruction Email requested, pursuant to his superior's instructions. During this conversation with Relator, Mr. Chaney showed Relator an email on Mr. Cheney's computer displaying what Mr. Chaney identified for Relator as being the Lockheed Instruction Email. Given this exchange, as well as Relator's personal knowledge that the Termination Liability Funding Forecast spreadsheet (i.e. the underlying invoice) gets submitted by Matrix to Lockheed and, subsequently, by Lockheed to the U.S. Government, Relator understood that: i) Matrix's cumulative engineering labor costs reflected in Column 15 of the Termination Liability Funding Forecast spreadsheet were inaccurate; ii) Lockheed and the U.S. Government had been fraudulently billed an excess of $1,000,000.00; and iii) Matrix had falsely recharacterized its request for PBPs that were reflected in Column 19 of the Termination Liability Funding Forecast spreadsheet.

89.    Furthermore, Mr. Chaney—again, Matrix's head of Engineering at the time—admitted to Relator during the same conversation that there was no backup for the engineering labor costs reflected in Column 15 of the Termination Liability Funding Forecast spreadsheet and that Matrix did not have a sufficient engineering

workforce to justify its engineering labor costs incurred during the time period reflected in the Termination Liability Funding Forecast spreadsheet.

90.    Moreover, based upon Relator's own familiarity with the number of engineers employed by Matrix during the time period reflected in the Termination Liability Funding Forecast spreadsheet, Relator knew that Matrix did not have a sufficient engineering workforce to credibly support Matrix's purported engineering labor costs as reflected in Column 15 of the Termination Liability Funding Forecast spreadsheet.

91.    Based on Relator's personal knowledge, the Underlying Fraudulent Scheme was and/or is able to thrive, in part, due to Matrix's endemic lack of oversight and internal mechanisms to assure billing accountability (including a lack of a billing-review process to ensure that invoices are accurate and substantiated and that revenue is appropriately recognized).    Furthermore, based upon Relator's personal knowledge, the Underlying Fraudulent Scheme was and/or is able to continue with impunity due to, in part, Matrix's history of controller turnover (which itself has contributed to Matrix's endemic lack of oversight and internal mechanisms to assure billing accountability).    Indeed, as previously mentioned, Relator was Matrix's fifth Controller in the course of three years.

C. Defendants' Conspiracy to Present a False Claim and Make a False Record

92.    Matrix—with ITT's knowledge—engaged in the Underlying Fraudulent Scheme.

93.    More specifically, based on the allegations above, it is clear that Matrix—with ITT's knowledge—presented a claim (i.e. the Termination Liability Funding Forecast spreadsheet), which Defendants knew to be false, to Lockheed (and it was foreseeable that Lockheed would subsequently submit for reimbursement from to the U.S. Government).

94.    Furthermore, based on the allegations above, it is clear that Matrix—with ITT's knowledge—made a record (i.e. the Termination Liability Funding Forecast spreadsheet), which Defendants knew to be false, and which was material to a false claim in that Matrix made the false record (i.e. the Termination Liability Funding Forecast spreadsheet), in part, for the purpose of inducing the U.S. government to pay Lockheed and Matrix.

95.    That Matrix and ITT engaged and/or otherwise had knowledge of the Underlying Fraudulent Scheme is evidenced by, for example:

a. the Improper Revenue Recognition Email, reflecting Matrix's and ITT's knowledge (via ITT employees, Karen LaRue, Thomaz London, John

Capela, and Le Le Tran, respectively)[14] of Matrix's systematic practice of improperly recognizing revenue no later than April of 2020 (albeit Matrix clearly had knowledge before such date given that it had been engaging in the systematic practice of improperly recognizing revenue as early as 2019);

b. the fact that Matrix and ITT/with ITT's knowledge (via Jeff Chaney, Matrix's head of Engineering at the time),[15] in October of 2021, carried out, pursuant to his superior's instructions, the Lockheed Initiator's directives pursuant to the Lockheed Instruction Email, resulting in Matrix's systematic practice of false recharacterization of requests for PBPs.

96. The Defendants' conspiracy to commit the Underlying Fraudulent Scheme (i.e. Defendants' unlawful agreement to violate 31 U.S.C. § 3729(a)(1)(A) and (B)) is evidenced by each Defendant's manner of engagement in and/or knowledge of the Underlying Fraudulent Scheme (i.e. acts performed in furtherance

---

[14] As mentioned above, following ITT's acquisition of Matrix, certain ITT employees, who were involved in and/or otherwise had knowledge of the Underlying Fraudulent Scheme, became so involved in the business affairs of Matrix that such employees' involvement and/or knowledge of the Underlying Fraudulent Scheme can be fairly imputed upon Matrix. Karen LaRue, Thomaz London, John Capela, and Le Le Tran are such individuals.

[15] As mentioned above, along the same vein, following ITT's acquisition of Matrix, certain Matrix employees, who were involved in and/or otherwise had knowledge of the underlying fraudulent scheme, became, in essence, ITT employees and/or were under the direction and control of ITT, such that their involvement and/or knowledge of the underlying fraudulent scheme can be fairly imputed upon ITT. Jeff Chaney is such an individual.

of the conspiracy)—as described above—which resulted in damage to the U.S. Government (i.e. again, it was foreseeable that, the U.S. Government received an excess of $1,000,000.00 in fraudulent billings).

D. The Ongoing Nature of the Underlying Fraudulent Scheme

97.     Defendants' Underlying Fraudulent Scheme is ongoing and, therefore, that the U.S. Government's damages continue to accrue given the ease by which the Underlying Fraudulent Scheme, and specifically the Lockheed Initiator's purported instructions to bill Lockheed in excess of Matrix engineering labor costs, has been carried out to date.

**COUNT I**
**Violation of the FCA: Presentation of False or Fraudulent Claims for Payment**
**31 U.S.C. § 3729(a)(1)(A)**

98.     Relator realleges and incorporates by reference the allegations of paragraphs 1 through 97 of this Complaint, as though fully set forth herein.

99.     The Defendants violated 31 U.S.C. § 3729(a)(1)(A) by knowingly (with actual knowledge or deliberate ignorance or reckless disregard of the truth) presenting, or causing to be presented, false or fraudulent claims for payment or approval to the U.S. Government resulting in Defendants receiving payments from the U.S. Government to which it was not entitled.

100.     Specifically, Defendants knowingly (with actual knowledge or deliberate ignorance or reckless disregard of the truth) presented or caused to be

presented, false or fraudulent claims for payment or approval to the U.S. Government at least by: (i) fabricating engineering hours and submitting false certifications of performance and requests for payment regarding the same to the U.S. Government resulting in an excess of $1,000,000.00 in fraudulent billings to the U.S; and (ii) falsely recharacterizing the advanced-payments as earned "revenue" (as opposed to "liabilities" owed on advanced-payments), thus allowing Matrix to "make room" for an excess of $1 million in fabricated engineering labor costs presented to the U.S. Government, while decreasing the likelihood of scrutiny or detection.

101.   More specifically, Matrix presented a claim (i.e. the Termination Liability Funding Forecast spreadsheet), which Defendants knew to be false, to Lockheed (which Lockheed subsequently presented to the U.S. Government) for the purpose of inducing the U.S. government to pay Lockheed and Matrix.

102.   Furthermore, Matrix made a record (i.e. the Termination Liability Funding Forecast spreadsheet), which Defendants knew to be false, and which was material to a false claim in that Matrix made the false record (i.e. the Termination Liability Funding Forecast spreadsheet), in part, for the purpose of inducing the U.S. government to pay Lockheed and Matrix.

103.   To this end, Defendants knowingly and falsely presented or caused to be presented false and fraudulent claims for payment, within the Termination

35

Liability Funding Forecast spreadsheet, to the U.S. Government for which Matrix fraudulently fabricated a substantial portion of the engineering hours expended and billed to the U.S. Government, at Lockheed's instruction.

104.    Further, despite Relator expressing his concerns regarding Matrix's purported engineering labor costs related to the Matrix Subcontract in an email to certain Matrix superiors on or around June 9, 2022, Matrix did nothing to prevent or reverse its fraudulent collection of unsubstantiated engineering hours and mischaracterized PBPs already paid or to be paid by the U.S. Government.

105.    If the U.S. Government had known that Defendants had presented or caused to be presented false claims based on these false, inaccurate, and improper billings the U.S. Government would have refused to adjust its contract with Lockheed and refused to pay the false billings based on the false engineering hours and/or taken other appropriate actions to ensure that Defendants did not receive or retain such payments to which it was not entitled, including by recouping payments through administrative processes, payment adjustments, or obtaining repayments in enforcement actions.

106.    By reason of the false claims that Defendants knowingly presented or caused to be presented, the United States has been damaged in a substantial amount to be determined at trial, and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

## COUNT II
## Violation of the FCA: Making and Using False Records or Statements
## 31 U.S.C. § 3729(a)(1)(B)

107.    Relator realleges and incorporates by reference the allegations of paragraphs 1 through 97 of this Complaint as though fully set forth herein.

108.    Defendants violated 31 U.S.C. § 3729(a)(1)(B) by knowingly (with actual knowledge or deliberate ignorance or reckless disregard of the truth) making, using, or causing to be made or used false records and statements material to false or fraudulent claims for payment or approval to the U.S. Government resulting in Defendants receiving payments from the U.S. Government to which it was not entitled.

109.    Specifically, Defendants knowingly (with actual knowledge or deliberate ignorance or reckless disregard of the truth) made, used, or caused to be made or used false records and statements material to false or fraudulent claims for payment or approval to the U.S. Government at least by: (i) fabricating engineering hours and submitting false certifications of performance and requests for payment regarding the same to the U.S. Government resulting in an excess of $1,000,000.00 in fraudulent billings to the U.S; and (ii) falsely recharacterizing the advanced-payments as earned "revenue" (as opposed to "liabilities" owed on advanced-payments), thus allowing Matrix to "make room" for an excess of $1 million in

fabricated engineering labor costs presented to the U.S. Government, while decreasing the likelihood of scrutiny or detection.

110.    More specifically, Matrix presented a claim (i.e. the Termination Liability Funding Forecast spreadsheet), which Defendants knew to be false, to Lockheed (which Lockheed subsequently presented to the U.S. Government) for the purpose of inducing the U.S. government to pay Lockheed and Matrix.

111.    Furthermore, Matrix made a record (i.e. the Termination Liability Funding Forecast spreadsheet), which Defendants knew to be false, and which was material to a false claim in that Matrix made the false record (i.e. the Termination Liability Funding Forecast spreadsheet), in part, for the purpose of inducing the U.S. government to pay Lockheed and Matrix.

112.    To this end, Defendants knowingly and falsely presented or caused to be presented false and fraudulent claims for payment, within the Termination Liability Funding Forecast spreadsheet, to the U.S. Government for which Matrix fraudulently fabricated a substantial portion of the engineering hours expended and billed to the U.S. Government, at Lockheed's instruction.

113.    Further, despite Relator expressing his concerns regarding Matrix's purported engineering labor costs related to the Matrix Subcontract in an email to certain Matrix superiors on or around June 9, 2022, Matrix did nothing to prevent or

reverse its fraudulent collection of unsubstantiated engineering hours and mischaracterized PBPs already paid or to be paid by the U.S. Government.

114. If the U.S. Government had known that Defendants had presented or caused to be presented false claims based on these false, inaccurate, and improper billings the U.S. Government would have refused to adjust its contract with Lockheed and refused to pay the false billings based on the false engineering hours and/or taken other appropriate actions to ensure that Defendants did not receive or retain such payments to which it was not entitled, including by recouping payments through administrative processes, payment adjustments, or obtaining repayments in enforcement actions.

115. By reason of the false claims that Defendants knowingly presented or caused to be presented, the United States has been damaged in a substantial amount to be determined at trial, and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

## COUNT III
### Violation of the FCA: Conspiracy
### 31 U.S.C. § 3729(a)(1)(C)

116. Relator realleges and incorporates by reference the allegations of paragraphs 1 through 97 of this Complaint as though fully set forth herein.

117.    In violation of 31 U.S.C. § 3279(a)(1)(C), Defendants conspired to defraud the U.S. Government by getting false or fraudulent claims allowed or paid by the U.S. Government.

118.    Specifically, upon Lockheed's instruction, Defendant Matrix and ITT fabricated engineering hours on a false claim for payment (i.e. the Termination Liability Funding Forecast spreadsheet), which Defendants knew to be false and which Defendants knew would be subsequently presented to the U.S. Government for the purpose of inducing the U.S. government to pay Lockheed and Matrix in violation of 31 U.S.C. §§ 3279(a)(1)(A) and (B).

119.    Defendants authorized their various officers, agents, and employees to take the actions set forth above.

120.    As set forth in the preceding paragraphs, Defendants conspired to violate 31 U.S.C. §§ 3279(a)(1)(A) and (B) and have thereby damages the U.S. Government by their actions in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, *qui tam* Relator respectfully requests that judgment be entered in its favor against Defendants as follows:

a) On Count I and Count II for relief (violations of the FCA, 31 U.S.C. §§ 3729(a)(1)(A), 3729(a)(1)(B)), a judgment against Defendants for treble the U.S. Government's damages, in an amount to be determined at trial, plus a

civil penalty in the maximum applicable amount for each violation of the FCA by Defendants;

b) On Count III for relief (violations of the FCA, 31 U.S.C. § 3729(a)(1)(C)), a judgment against Defendants for damages to the extent allowed by law.

c) that Relator be awarded the maximum recovery amount pursuant to 31 U.S.C. § 3730(d);

d) that Relator be awarded all costs of this action, including attorneys' fees, expenses; and pre-judgment and post-judgment interest; and

e) that the U.S. Government and Relator recover such other relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Relator demands a jury trial in accordance with Federal Rule of Civil Procedure 38.

**DATED: January 31, 2023**

Respectfully submitted,


*/s/ Joseph I. Zumpano*
Joseph I. Zumpano
Fla. Bar. No. 0056091
jzumpano@zplaw.com
Leon N. Patricios
Fla. Bar No. 0012777
lpatricios@zplaw.com
ZUMPANO PATRICIOS, P.A.
312 Minorca Ave.
Coral Gables, FL 33134